IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| DOUGLAS TOOLE, DPM<br>TAYLOR G. WRIGHT PC<br>6405 SOUTH 3000 EAST, SUITE 300<br>SALT LAKE CITY, UT 84121<br><br>          *Plaintiff*,<br>     *v.*<br><br>ROBERT F. KENNEDY, JR., in his official<br>capacity as Secretary of Health and Human<br>Services,<br>200 Independence Avenue SW<br>Washington, DC 20201,<br><br>          *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>Council Docket Number:<br><br>M-25-1986<br><br>OMHA Appeal Number:<br>3-14335366953 |

**COMPLAINT**

Plaintiff Dr. Douglas Toole, one of the owners of Taylor G. Wright PC, in his Complaint

against Defendant Robert F. Kennedy, Jr. in his official capacity as Secretary of Health and Human

Services (the "Secretary") alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Dr. Douglas Toole is a Podiatry Specialist who is enrolled in the Medicare

program and provides wound care services to Medicare beneficiaries who suffer from diabetes and

its malicious co-morbidities such as veinous leg ulcers ("VLUs"). VLUs of the type that Plaintiff's

patients suffer from often lead to chronic, open wounds that, left untreated, result in amputation

and even death. They are difficult to treat and heal through conventional wound treatment methods.

In addition to creating amputation risks, VLUs negatively impact patients' quality of life due to

pain, odor, decreased mobility, and social isolation.  Fortunately, wound care experts like Dr.

1

Toole can treat VLUs and other similar chronic wounds with human tissue products derived from donated amniotic tissue, i.e., a skin substitute product.

2.      Dr. Toole treated a Medicare beneficiary, P.Z., for VLUs that never closed, even after conventional wound treatment methods. After a period of debridement and other conventional treatments with little effect, Dr. Toole treated P.Z. with Amnio Wrap2, a skin substitute product, to cover the refractory wound, and its innate properties stimulated and promoted wound healing. Dr. Toole applied separate treatments of these products over the course of several weeks, and the wounds significantly improved.

3.      The Secretary determined that Amnio Wrap2 and its application to treat these and other of Plaintiff's patients was reasonable and necessary—a necessary condition for Medicare coverage and payment. The Secretary then made an about face and has recently begun to recoup past payments for these services and threatens to deny coverage of Amnio Wrap2 for future services finding, *inter alia*, that use of the skin substitute was "experimental and investigational." When classified as experimental and investigational, the use of Amnio Wrap2 to treat a chronic wound are no longer considered reasonable and necessary and therefore do not meet the coverage standard for Medicare payment.

4.      This is not an isolated incident. Beginning in 2023, at the direction and with the knowledge of CMS, Medicare contractors have engaged in a practice by which they reopen and review previously paid Medicare claims for skin substitutes derived from amniotic tissue and deny them as experimental and investigational, even though Medicare has historically covered such products either on a case-by-case basis (at issue here) or otherwise under a local coverage

2

determination, i.e., a decision by a Medicare Administrative Contractor ("MAC") as to whether or not a particular item or service is covered within the MAC's assigned geographic region.

5.     This civil action arises from an administrative appeal challenging the Secretary's decision to deny Medicare coverage for Amnio Wrap2 and hold Dr. Toole liable for the denied charges in excess of $43,200. Dr. Toole alleges the following in support of his claims and request for relief.

## PARTIES

6.     Plaintiff Dr. Douglas Toole is one of the owners of Taylor G. Wright PC and a resident of Utah. Plaintiff is enrolled in the Medicare program (Medicare ID: 3DR7DY4KF75) and furnishes healthcare services to Medicare beneficiaries, including patients who have been diagnosed with diabetes and suffer from chronic wounds in the form of DFUs that do not respond to conventional treatment methods.

7.     The Defendant, Robert F. Kennedy, Jr. is the Secretary of HHS, which administers the Medicare and Medicaid programs established under titles XVIII and XIX of the Social Security Act. Defendant Secretary is sued in his official capacity only. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs. References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## JURISDICTION AND VENUE

8.     This action arises under the Medicare Statute, title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

9.     Jurisdiction is proper under 42 U.S.C. § 405(g), 42 U.S.C. § 1395ff(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

3

10.     Venue is proper in this judicial district in accordance with 42 U.S.C. § 405(g), and 28 U.S.C. § 1391(e), and 42 C.F.R. § 405.1136(b).

### GENERAL ALLEGATIONS

**A.      The Medicare Program and Its Coverage Determinations**

11.     Medicare is the federal health insurance program for the elderly and disabled. The Secretary is responsible for administering the Medicare program and does so by delegating implementation and oversight to CMS. The Medicare statute divides the benefits available under the program into separate parts. Medicare Part A covers inpatient hospital services, home health services and hospice services. Medicare Part B, which is relevant to the claims in this civil action, covers physician services that are not provided in an inpatient setting. Physician services include items, supplies, and physician-administered drugs that are provided as part of a physician office visit or procedure. Skin substitute products provided in conjunction with a physician's treatment of chronic wounds have been covered under Medicare Part B.

12.     The Medicare statute authorizes the Secretary to enter into agreements with MACs to administer some of the day-to-day functions of the Medicare program. Absent a national or local coverage determination, the MACs' responsibilities include making initial determinations on a case-by-case basis as to whether to pay for services provided to Medicare beneficiaries—i.e., whether to "cover" those services—when claims are submitted for reimbursement.

13.     Dictated by the Medicare statute, the MACs approve payment for items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). CMS has interpreted this "reasonable and necessary" standard to mean the item or service is medically appropriate (including its duration and frequency), safe and effective, and not experimental or investigational. *See, e.g.*, Medicare Program Integrity Manual ("MPIM") § 13.5.4 (last revised Feb. 12, 2019), https://tinyurl.com/55d6mkp7.

4

14.    For the MAC to consider coverage and payment for any item or service, the information submitted by the provider must corroborate the documentation in the beneficiary's medical record and confirm that Medicare coverage criteria have been met. MPIM § 3.3.2.1 (last revised Dec. 28, 2024), https://tinyurl.com/yxtnf78e.

**B.    FDA Regulation of Skin Substitutes**

15.    Skin substitutes are regulated by the Food and Drug Administration ("FDA"). The types of skin substitutes used to treat DFUs are approved through one of several regulatory pathways established by the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Public Health Service Act ("PHSA"). For example, skin substitutes can be regulated as devices and reach the market through a premarket notification, known as 510(k) clearance, which requires the product to be substantially equivalent to another device previously approved for marketing. Second, skin substitutes can be regulated as devices and be approved as a device through a premarket approval ("PMA"). Finally, when they are comprised of human cells, tissues, or cellular and tissue-based products ("HCT/Ps") and meet certain criteria, FDA has exempted skin substitutes from these premarket review and approval processes and regulated them exclusively under Section 361 of the PHSA and 21 C.F.R. Part 1271.  *See* 21 C.F.R. § 1271.10(a) (setting forth criteria).  FDA commonly refers to such products as "361 HCT/Ps." Amniotic tissue products that are used as skin substitutes frequently meet the requirements for classification as 361 HCT/Ps.

16.    FDA does not require clinical trial data to establish the safety and efficacy of 361 HCT/Ps. This judgment is grounded in the fact that HCT/Ps regulated solely under Section 361 and 21 C.F.R. Part 1271 are intended to perform the same basic functions or function in the recipient as in the donor.  FDA has explained, "[b]asic functions are well understood; it should not be necessary to perform laboratory, pre-clinical, or clinical studies to demonstrate a basic function

or functions for the purpose of applying the HCT/P regulatory framework." FDA, Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use (July 2020), p.17, available at https://tinyurl.com/77h6ur7m (Sec. IV, Question 3) ("FDA Homologous Use Guidance").

17.     The FDA's Tissue Reference Group ("TRG") provides a single agency reference point for product-specific questions regarding regulation of HCT/Ps.  The TRG has a voluntary, informal mechanism through which a manufacturer may request a recommendation regarding the classification of an HCT/P. Manufacturers that initiate this process receive a TRG recommendation about how the criteria in 21 C.F.R. § 1271.10(a) apply to the manufacturer's HCT/P for a given indication. *See* FDA, Tissue Reference Group (Jan. 11, 2023), https://tinyurl.com/yebcykna.

18.     Medicare—consistent with FDA's Section 361 regulatory framework—has historically covered the variety of different amniotic tissue membrane HCT/Ps that are marketed for skin wounds so long as they were being used as biologic covers for refractory wounds.

19.     Amnio Wrap2 is confirmed by the FDA TRG to meet the criteria for 361 HCT/Ps.

20.     The MAC here has historically covered Dr. Toole's use and application of Amnio Wrap2 to treat refractory wounds. In other jurisdictions, the MACs have covered Amnio Wrap2 (and all 361 HCT/Ps) under local coverage determinations since 2015 that are still in effect today.[1] *See, e.g.*, *Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds*, Centers for Medicare & Medicaid Services Local Coverage Determination (L35041) (original effective date Oct. 1, 2015).

---

[1] Notwithstanding potential changes to existing LCDs governing the use of skin substitutes, at least since 2015, several MACs have found HCT/Ps to be reasonable and necessary and therefore covered by Medicare.

C.      The Medicare Appeals Process

21.     A Medicare provider that is dissatisfied with the MAC's initial determination of a claim may engage in the administrative appeals process set forth in 42 U.S.C. § 1395ff and 42 C.F.R. Subpart I.   The appeals process includes four levels of appeal before the Medicare provider can obtain judicial review.

22.     A redetermination is the first level of appeal after the initial determination. The MAC performs the redetermination through an independent review of the initial determination. In conducting a redetermination, the MAC reviews the evidence and findings upon which the initial determination was based, as well as any additional evidence the parties submit or the contractor obtains on its own.  42 C.F.R. § 405.948.

23.     Providers that disagree with the MAC's redetermination decision may request a reconsideration by a Qualified Independent Contractor ("QIC"). A reconsideration consists of an independent, on-the-record review of an initial determination.  In conducting a reconsideration, the QIC reviews the evidence and findings upon which the initial determination, including the redetermination, was based, and any additional evidence the parties submit or that the QIC obtains on its own.  If the initial determination involves a finding on whether an item or service is reasonable and necessary for the diagnosis or treatment of illness or injury, a QIC's reconsideration must involve consideration by a panel of physicians or other appropriate health care professionals, and be based on clinical experience, the patient's medical records, and medical, technical, and scientific evidence of record to the extent applicable.  *See* 42 C.F.R. § 405.968(a)(1).

24.     Providers that disagree with the reconsideration decision may request a hearing with the Office of Medicare Hearings and Appeals, typically with an ALJ.

7

25.     Where a party is dissatisfied with the ALJ's decision, that party may appeal the ALJ's decision to the Medicare Appeals Council ("Council").  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1). The Council may also review the ALJ's decision on its own motion.  42 C.F.R. § 405.1100. The Council undertakes a *de novo* review of the ALJ's decision considering all of the evidence in the administrative record.  42 C.F.R. § 405.1100(c).

26.     A party may file an action in a federal district court within sixty calendar days after the date it receives notice of the Council's decision.  42 C.F.R. § 405.1136; *see also* 42 U.S.C. §§ 405(g), 1395ff(b).

## FACTUAL AND PROCEDURAL BACKGROUND

27.     Dr. Toole is one of the owners of Taylor G. Wright PC and a resident of Utah. Dr. Toole furnishes healthcare services to Medicare beneficiaries, including patients who have been diagnosed with diabetes and suffer from chronic wounds in the form of pressure ulcers that do not respond to conventional treatment methods.

28.     P.Z. was a 62-year-old male on the date of service suffering from peripheral vascular disease and multiple other co-morbidities. P.Z. was experiencing a several VLUs on his lower extremities that refused to respond to treatment for more than 30 days.

29.     The treating clinician believed the best (and only) tool to heal P.Z.'s wound was Amnio Wrap2, a skin substitute product. The treating clinician believed that the risk to P.Z. of proceeding with any other approach was too high.

30.     The treating clinician applied skin substitute products to P.Z. on several occasions in March 2023, particularly on March 22, 2023, the treatment at issue in this matter.

31.     Dr. Toole billed CMS for Amnio Wrap2 and its application. Amnio Wrap2 is billed under HCPCS code Q4221. Dr. Toole also billed for the application of Amnio Wrap2 under

Current Procedural Terminology ("CPT") codes 15271 and 15272. CMS initially covered and paid the treatments for all codes.

32. Through a post-payment audit by a Medicare contractor, CMS denied coverage for Amnio Wrap2 treatment provided to P.Z. on March 22, 2023. Notably, it did not deny coverage for any other wound care the treating clinician provided to P.Z.

33. Dr. Toole filed a redetermination request (the first level of appeal) regarding the post-payment denial of coverage for the March 22, 2023 service. The MAC upheld the denial of the claim on the grounds that the medical record documentation was insufficient to demonstrate the necessary 30 days of standard wound care. The MAC also found that Dr. Toole was liable for the overpayment.

34. Dr. Toole filed QIC reconsideration requests (the second level of appeal) following CMS' denial of its redetermination request.

35. The QIC also upheld the denial, but on the grounds that there was insufficient peer reviewed, evidence-based literature to support the use of Amnio Wrap 2 to treat P.Z.

36. Dr. Toole next filed a request for an ALJ hearing for the March 22, 2023 service (the third level of appeal).

37. The hearing on the took place on January 14, 2025. At the hearing, Dr. Toole appeared and testified and responded to each of the ALJ's concerns.

38. On February 4, 2025, the ALJ handed down its decision decisions finding against Dr. Toole for the March 22, 2023 service. The ALJ found that the skin substitute and its application were not covered by Medicare due to a lack of "peer-reviewed, evidence based literature" supporting Dr. Toole's position that Amnio Wrap2 was reasonable and necessary and not

9

experimental or investigative. The ALJ then found that Dr. Toole was financially liable for the overpayment.

39.    On April 10, 2025, Dr. Toole asked the Medicare Appeals Council (the "Council") to review the ALJ's decision (the fourth level of appeal).

40.    The Council did not enter a decision within its 90-day timeframe, so Dr. Toole requested that the Council escalate the review to this Court. The Council approved the escalation request on March 26, 2026.

41.    Dr. Toole now timely appeals to this Court (the fifth level of appeal).

## CLAIMS FOR RELIEF

### COUNT I
(Violation of the Administrative Procedure Act)

42.    Plaintiff incorporates and realleges Paragraphs 1 through 41 above as if fully set forth herein.

43.    Congress has mandated that a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(D).

44.    An agency action is arbitrary and capricious if it departs from agency precedent without explanation.  "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).

45.    Moreover, an agency decision is arbitrary and capricious if the agency treats similar cases dissimilarly.  "A fundamental norm of administrative procedure requires an agency to treat like cases alike.  If the agency makes an exception in one case, then it must either make an

exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

46.    The ALJ's decision states that there was not sufficient evidence in the medical literature supporting the use and efficacy of Amnio Wrap2 for P.Z.'s treatment, making the use of those products "experimental and investigative" and therefore ineligible for Medicare coverage.

47.    This denial is inexplicable as the treatments at issue in this case are indistinguishable from countless other treatments involving Amnio Wrap2 that the Secretary agreed were reasonable and necessary. Neither the ALJ nor Secretary has offered any reasoned explanation for now singling out skin substitutes and classifying them as "experimental and investigational" when the Secretary approved and continues to approve Amnio Wrap2 for other patients suffering from non-healing wounds like P.Z.

## COUNT II
(Violation of the Medicare Statute)

48.    Dr. Toole incorporates and realleges Paragraphs 1 through 47 above as if fully set forth herein.

49.    The Medicare Act entitles beneficiaries, including Dr. Toole's patients, to payment for all reasonable and necessary medical and other health services provided to beneficiaries, 42 U.S.C. § 1395k(a)(2), except for services the statute specifically excludes.  42 U.S.C. § 1395y.

50.    Dr. Toole treated P.Z. with Amnio Wrap2, which is reasonable and medically necessary, as evidenced by the MAC's initial coverage of Amnio Wrap2 for the treatment provided to P.Z. and, in other MACs' jurisdictions, the continued coverage of Amnio Wrap2 under local coverage determinations since 2015 that are still in effect today.

11

51.    The Secretary's about face without a reasonable explanation prohibits Part B payment for Amnio Wrap2 —a reasonable and necessary treatment for P.Z.—and violates the Medicare statute.

**REQUEST FOR RELIEF**

52.    Dr. Toole respectfully requests that this Court enter judgment in his favor and grant the following relief:

(1) An order reversing the Council's decision and requiring the Secretary to reimburse Dr. Toole for the denied dates of service in the Council's decision.

(2) A declaration that the treatments provided on the denied dates of service were lawful;

(3) Award Dr. Toole costs and attorney's fees as appropriate; and

(4) Providing such other relief as the Court may consider appropriate.

Date:  May 26, 2026                          Respectfully submitted,

/s/ Jacob B. Stone
Jacob B. Stone
*Counsel for Plaintiff*